OIL FIELDS CORPORATION *v.* MEEK.

Opinion delivered February 25, 1929.

*Albert L. Wilson,* for appellant.
*Harry E. Meek,* for appellee.

SMITH, J. On the 10th day of March, 1924, J. H. Meek was appointed receiver in a cause pending in the chancery court of Ouachita County, involving the extensive holdings of the Oil Fields Corporation, a defendant in the suit.

Several common law trusts had been promoted by Gordon Ingalls, John S. Dashko, and their associates, which, on May 17, 1923, were consolidated as and absorbed by the Oil Fields Corporation, a corporation which was organized under the laws of Delaware for that purpose, and hereinafter referred to as the corporation.

These trust estates had been financed by solicitations through the mails and newspaper advertisements, inviting the public to invest in the beneficial certificates of the trust estates, and these invitations had been accepted by more than ten thousand persons, scattered over the United States and foreign countries, who invested over a million seven hundred thousand dollars in the beneficial certificates. Certain of the promoters of these trusts and organizers of the corporation were convicted in the Federal court on the charge of the fraudulent use of the mails, and thereafter this suit was brought, and J. H. Meek was appointed receiver for the corporation. On May 19, 1924, the receiver filed a re-

port, in which he made an inventory of the assets and liabilities of the corporation, and thereafter made monthly reports of his receivership, as the order appointing him required that he should do.

A decree was entered November 27, 1925, discharging the receivership and directing the receiver to restore the property to the corporation as of December 1, 1925, and to make a final report, which was filed January 16, 1926. Exceptions were filed to this report by the corporation on January 25, 1926, and the receiver filed a demurrer to the exceptions, which the court sustained. An appeal was duly prosecuted from this decree, and it was held on the appeal that the chancellor erred in sustaining the demurrer and in confirming the final report of the receiver, and that testimony should have been heard upon these exceptions, and the cause was remanded with directions to overrule the demurrer, and for further proceedings. *Oil Fields Corporation* v. *Meek,* 175 Ark. 318, 299 S. W. 29.

Upon the remand of the cause, much testimony was offered upon the exceptions, and the court made a finding in favor of the receiver upon each of them. The court found, however, that the receiver had failed to obey an order made October 5, 1926, in which the receiver was directed to pay over to the corporation the sum of $23,431.06 in his hands, but had appealed from this order, holding the money until January 16, 1928, at which time he filed a supplemental report, and that interest at six per cent. should be charged upon this sum between these dates. An appeal was prayed, and has been duly prosecuted by the corporation, and the receiver has prayed a cross-appeal.

After several days had been devoted to hearing the testimony on the exceptions, the trial was suspended, and two accountants were appointed to audit the receiver's report. Each side selected an accountant, and it was stipulated by the parties that the joint report of the auditors should be offered in evidence in lieu of the original books of the receiver.

It is first insisted that the corporation sold some oil to various parties just before the appointment of the receiver, amounting to $2,502.16, and that the receiver took over this collection and had not accounted therefor. It appears, however, that the receiver did charge himself with the full amount of these accounts, and there is nothing in the report of the auditors—which appears to have been very exhaustive—to indicate that a proper accounting for these items had not been made. It may be said that one of these auditors was the president of the corporation, who was very hostile to the receiver and the receivership, and who was thoroughly familiar with the affairs of the corporation.

It was alleged in the exceptions that the receiver had reported and sought credit for excessive expenditures for operating leases owned by the corporation. Much testimony was heard upon this item, which we have considered but do not review, as no useful purpose would be served in doing so. The receiver was directed, in the order appointing him, to operate the leases, and in doing this he would be liable only for failure to operate them honestly and in the exercise of his best judgment, and would not be liable for poor results or small profits, unless it were shown that his operations were reckless or were characterized by bad faith. Section 75, page 71, and § 89, pp. 81 and 82, chapter "Receivers," 23 R. C. L.; note to case of *Shedd* v. *Seefeld,* 120 Am. St. Rep. 269, at page 278 thereof; *State* v. *Germania Bank* 130 Am. St. Rep. 599; *State ex rel. Collins* v. *Gooch,* 2 Am. St. Rep. 284; 1 Tardy's Smith on Receivers (2 ed.), § 43, page 199, § 48, pages 208 and 209. That showing was not made; indeed, it is strongly insisted that the receiver's management and the results secured by him compare favorably and to the receiver's advantage with the operations of the corporation before the receivership.

It is sought to charge the receiver with the loss of ten cents per barrel on oil sold to the Standard Oil Company, upon the theory that the oil could have been

sold to other companies at a price ten cents per barrel greater than that paid by the Standard Oil Company. It appears that there are four or five major pipe-line companies which buy oil in the field where the lands of the corporation are located, and that these companies announce their "posted price," which is usually the same for all of them, for oil, and that the price of oil is so governed until another price is "posted," either an advance or a decline over the former price which it supersedes. There are smaller pipe-line companies operating in the field, but operators generally prefer to sell to the larger companies, for the reason that the operator, after selling his oil, is unable to retain a lien on it, and must accept an unsecured debt for his oil. The smaller pipe line companies therefore usually offer and pay a price for oil in excess of the posted price, and it is this excess over the price paid by the Standard Oil Company which the exception would charge to the receiver. The court overruled this exception, and charged the receiver only with the price paid by the Standard Oil Company, the price received, and the wisdom and justice of this ruling fully appear from the discussion of the next item.

The corporation, before the appointment of the receiver, sold oil to one of the smaller pipe-line companies, the Arkansas Pipe Line & Navigation Company. The last-named corporation appears to have been organized by Ingalls and his associates for the purpose largely of buying oil of the corporation, and, at the time of the appointment of the receiver, it was indebted to the corporation in the sum of $79,017.33. The pipe-line company was placed in a receivership by the State court because of the failure to pay its office expenses, and, ten days after Meek's appointment as receiver for the corporation, a proceeding was inaugurated to adjudge the pipe-line company a bankrupt, and that adjudication was made on April 8, 1924. Meek had been appointed receiver for the pipe-line company in the State court, and it is insisted that this company was not a bankrupt, and

that the receiver could and should have made that showing in opposition to the petition that it should be declared a bankrupt, and that, if this had been done, the pipe-line company would not have been adjudged a bankrupt, and a proper administration of its assets would have paid much, if not all, of its debts, and that the receiver should therefore be charged with this item.

The court properly overruled this exception. It is undisputed that the pipe-line company committed an act of bankruptcy when it was placed in the State court receivership through insolvency, and competent counsel unsuccessfully resisted the adjudication. It is not claimed that the receiver failed to account for any money received through the winding up of the affairs of the pipe-line company.

The principal exception relates to the loss of oil, which, it is insisted, was shown to have come into the receiver's hands and not accounted for.

It appears that, when the corporation began to produce oil, it found difficulty in selling its product because of a defect in the title, and this appears to have been the reason for the organization of the Arkansas Pipe Line & Navigation Company as a subsidiary corporation, and the only oil sold prior to the receivership had been sold to the Arkansas Pipe Line & Navigation Company. When the receiver took charge of the assets of the corporation, he found a large amount of production in storage. This storage was in earthen pits, some of which had been there for nearly two years. Testimony was offered as to the size and cubic content of these pits, and calculations based on these measurements were made, showing the quantity of oil on hand when Meek took charge. To this quantity there is added the amount of oil shown by the daily production reports of the receiver, and from this total there is subtracted the amount of oil which the receiver sold and accounted for. It is insisted that the receiver is liable for this difference.

Much testimony was taken on this item, and we think it clearly appears that a large per cent. of the

storage in the earthen pits was not pipe-line oil. Through exposure for months much of the volatile element had escaped through evaporation, and it was necessary to treat or cook the oil before it could be received by the pipe-line company, and in some of the pits the oil had solidified until it was "like axle-grease," and had to be boiled, and the loss from evaporation was from ten to fourteen per cent. There was in other pits a large proportion of water and basic sediment, referred to by all the witnesses as B.S., and there was testimony placing the per cent. of water and B.S. in some of the pits as high as sixty to seventy per cent. It was also shown very clearly that the daily production reports of oil were not to be identified with the pipe-line run reports, for the reason that the daily production reports included much water and B.S., which had to be eliminated before the residue was placed in the pipe line.

Upon a consideration of all the testimony we think it very clearly appears that the receiver's daily production report did not refer to pipe-line oil, but referred to the fluid as it came from the well, including the water and the B.S.

It was shown that the only accurate method of determining the net production from a well or a lease is to accept the pipe-line company's gauge, and the receiver appears to have accounted for all the oil thus measured, and there was no other oil. It is true that there were several of these pipe-line companies, but each of them kept records showing the quantity of oil measured and the owners thereof, and we think it fairly inferable that the corporation's president checked the pipe-line records of the different companies with the receiver's report; indeed, he stated that he "found their records coincided with the receiver's." Upon redirect examination, the witness materially qualified this statement; but, whether he made this check or not, it could easily have been done, and any discrepancy between the pipe-line run of oil and the report of the receiver could have been readily detected.

Another exception sought to charge the receiver with interest on the daily balances to his credit as receiver with the bank of which the receiver was president.

It may be first said that none of the banks in Camden, where the receivership was pending, paid interest on daily balances, and there was no order of the court for the receiver to so deposit funds that interest would be paid on them. It was shown that in August, 1924, after the appointment of the receiver in March of that year, a suit was brought to place the holdings of Ingalls, one of the principal promoters of the corporation, in bankruptcy, and the referee appointed in that proceeding made demand on the receiver for the surrender of all the property of the corporation, and it appears that this bankruptcy proceeding was not definitely disposed of until about April 1, 1925. In November, 1924, a motion was filed to discharge the receiver, and this motion appears to have been pending until that order was finally made. The account earned no interest, and we think there was no such breach of duty as would make it equitable to charge the receiver with interest on the funds in his hands until he was directed to pay them over. *Haddock* v. *Plymouth Coal Co.,* 237 Pa. 37, 85 Atl. 23; *Radford* v. *Folsom,* 55 Ia. 276, 7 N. W. 604; *Crawford* v. *Fickey,* 41 W. Va. 544, 23 S. E. 662; § 47, Tardy's Smith on Receivers (2d ed.).

Exceptions were filed to the fees allowed the receiver and to those paid his attorneys.

It appears that Mr. Albert L. Wilson is now the attorney for the corporation, and that he has been since its organization, that his salary has at all times been a thousand dollars per month, except during the receivership, and the attorneys for the receiver were allowed compensation at the same salary. Moreover, this compensation was not fixed upon the motion of the receiver or through any contract between him and the attorneys, but was fixed by the court upon the motion of the attorneys. As to the salary of the receiver, it may be said

that he was allowed compensation by the court at the rate of $500 per month, whereas the president of the corporation, to whose duties the receiver succeeded, was paid a monthly salary of one thousand dollars.

The receiver made a bond in a surety company, for which an annual premium of $500 was charged, and an exception was filed to the claim of the receiver for credit for this item. We concur in the view of the court below that this was a proper credit to the receiver, the amount of the compensation fixed by the court being taken into account.

An exception was filed to the allowance of an item of $30,000 paid to Powell, Smead & Knox, as assignees of Ingalls. The receiver submitted this demand to the court, and he was directed by the court to pay it. An affidavit stating that this was a just claim was filed in connection with it, made by the treasurer of the corporation, which was prepared by Mr. Wilson, who, as has been said, was the attorney for the corporation before the receivership. This demand having been paid under the order of the court, the receiver was properly given credit therefor. *Chipman* v. *Cook,* 169 Ark. 1012, 277 S. W. 37.

As has been said, the court charged the receiver with interest on the balance in his hands from the time he was ordered to pay it over until the order was obeyed, and the receiver has prayed a cross-appeal. No sufficient reason is shown for non-compliance with this order, and the receiver was therefore properly charged with interest on this item.

Upon a consideration of the entire cause we are unable to say that any finding of the court below is contrary to the preponderance of the evidence, and the decree in its entirety will therefore be affirmed.